In re **DIVERSIFIED TRANSPORTA-TION RESOURCES, INC.,** et al., **Debtors.**

**Paul KREBS, Trustee in Bankruptcy, Plaintiff,**

v.

**UTICA MUTUAL INSURANCE COMPANY and Bri Coverage Corporation, Defendants.**

Bankruptcy Nos. 84–02898 to 84–02909. Adv. No. 85–0506.

United States Bankruptcy Court, D. New Jersey.

June 17, 1988.

Charles Hoens, Lum, Hoens, Abeles, Conant & Danzis, Roseland, for Utica Mut. Ins. Co.

Richard D. Trenk, Ravin, Sarasohn, Cook, Baumgarten, Fisch & Baime, Roseland, for Paul Krebs, Trustee.

## OPINION

DANIEL J. MOORE, Bankruptcy Judge.

This matter is before the court on cross-motions for summary judgment. The court has jurisdiction pursuant to an Order of Reference entered by the United States District Court dated July 23, 1984 as provided in 28 U.S.C. § 157. This is a "core proceeding" as defined in 28 U.S.C. § 157(b)(2) and the judgment of this court can be appealed to the United States District Court for the District of New Jersey pursuant to 28 U.S.C. § 158. The following facts are not disputed.

Diversified Transportation Resources, Inc.; Sealand Terminal Corporation; United Terminals, Inc.; DTR Distribution Services, Inc.; Ellison, Inc.; DTR Fuel Technology, Inc.; DTR Management Services, Inc.; Open Road Express, Inc.; and J.T. Clark of Baltimore are collectively referred to hereafter as "debtors" or "DTR". Debtors operated a stevedoring business and the employees of the debtors were "employees"[1] as defined in the Longshoremen and Harbor Workers' Compensation Act ("Act" or "LHWCA"), 33 U.S.C. § 901 *et*

---

1. 33 U.S.C. § 902(3).

*seq.* DTR was an "employer"[2] covered by the LHWCA. The Act requires employers to pay compensation with respect to the disability or death of an employee. The employer may provide compensation insurance pursuant to § 932(a)(1) or it may act as a self-insured pursuant to § 932(a)(2) provided the employer furnishes adequate assurance either by a bond or the deposit of securities with the Secretary of Labor.

In order to comply with the provisions of subsection (a)(2) of § 932, the debtors on October 26, 1978 entered into a contract with the defendant Utica Mutual Insurance Company (Utica). Utica issued as surety an indemnity bond with respect to the debtors' compensation program and was obligated to discharge all of debtors' obligations under LHWCA in the event such obligations were not satisfied by the debtors.

After the bankruptcy petition, which was filed on May 29, 1984, the debtors were unable to meet their obligations under their self-insured workers' compensation program and Utica was called upon to satisfy the claims of debtors' employees in accordance with the suretyship agreement.[3] The total of claims paid by Utica was $4,817,-422.97. Utica retained the services of defendant BRI Coverage Corporation (BRI) to investigate and adjust workers' compensation claims of the debtors' employees. BRI also pursued employee claims against third parties responsible for injuries to employees. The sum of $581,912.33 has been recovered by BRI[4] on account of such claims. Of the total recoveries, $101,076.16 is on account of claims which totaled $450,-241.00 and were paid entirely by the debtor. The remaining recoveries relate to total claims by employees in the amount of

$1,194,399.00. These claims were paid in part by the debtors ($900,997.00) and in part by Utica ($293,402.00). Appendix A attached to this Opinion recapitulates the third party recoveries at issue and has been prepared by the court from Exhibits B and C attached to the Affidavit of Dennis M. Sweeney submitted by Utica.

The trustee's Complaint in this adversary proceeding seeks the turnover of all of the funds which were recovered by BRI from third parties responsible in whole or in part for the injuries to the debtors' employees as property of the estate. The responsive pleadings of Utica assert that Utica is entitled to the entire fund of recoveries from third parties. The surety places emphasis on the word "all" in § 33(h) of the Act (page 640 *infra*).

Utica filed this motion for summary judgment on January 15, 1988. The trustee has countered with a cross-motion for summary judgment. Both parties again maintain that they are entitled to 100% of the recoveries held by BRI. The Trustee claims that said funds are property of the debtors' estate by reason of the LHWCA and § 541 of the Bankruptcy Code. Utica maintains that it too is entitled to the funds by reason of the Act and also asserts subrogation rights under the common law.

\* \* \* \* \* \*

Bankruptcy Rule 7056 provides that Rule 56 of the Federal Rules of Civil Procedure governs summary judgment in adversary proceedings.[5] The purpose of summary judgment is to eliminate a trial in cases where it is unnecessary and would only cause delay and expense. *Goodman v. Mead Johnson & Co.,* 534 F.2d 566 (3rd Cir.1976), *cert. denied* 429 U.S. 1038, 97

---

2. 33 U.S.C. § 902(4).

3. The surety has not provided the court with a written copy of the suretyship agreement. The fact that there was an agreement between the parties, however, is not disputed. Utica's claim for subrogation is made pursuant to common law and the LHWCA.

4. Although BRI is named defendant in the within action, there have been no allegations that BRI is responsible for anything other than the turnover of the funds in its possession. BRI

takes the position that it is a "stakeholder and merely awaits direction as to the proper recipient of certain funds ..."

5. Rule 56(c) of the Federal Rules of Civil Procedure provides in relevant part: "The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."

S.Ct. 732, 50 L.Ed.2d 748 (1977). Summary judgment is proper where the facts are uncontested and the moving party is entitled to judgment as a matter of law. *See Matter of Borne Chemical, Co., Inc.*, 9 B.R. 263 (Bankr.N.J.1981). The court is of the opinion that it can resolve the dispute between the parties to this action based on the recited undisputed facts.

### LEGAL ANALYSIS

\* \* \* \* \* \*

Since both parties assert that their respective claims to the funds arise under the Act, a brief review of that law is appropriate.

The general scheme of the Longshoremen's and Harbor Workers' Compensation Act was to provide compensation to employees engaged in maritime employment, except as stated, for disability or death resulting from injury occurring upon the navigable waters of the United States where recovery through workmen's compensation proceedings might not validly be provided by state law. *Nogueira v. New York N.H. & H.R. Co.*, 281 U.S. 128, 131, 50 S.Ct. 303, 303, 74 L.Ed. 754, 757 (1930).

The Act provides maritime employees with a practical and expeditious remedy for work-related injuries while limiting the burden on employers by providing that their liability under the Act shall be "exclusive" of all other liability. 33 U.S.C. § 905(a); *Houston v. Bechtel Associates Professional Corp.*, 522 F.Supp. 1094, 1095 (D.D.C. 1981).

As noted earlier, the debtor was self-insured and prior to the commencement of this case, compensated its employees for their work-related injuries under the Act. Utica was not an insurer under § 932(a)(1) but as surety, furnished the bond to assure performance of the debtors' obligations under § 932(a)(2).

The most relevant provision of the Act for the purpose of this case is 33 U.S.C. § 933. Both the Trustee and Utica base their respective claims to the recovery fund on that section which provides in part as follows:

### § 933 COMPENSATION FOR INJURIES WHERE THIRD PERSONS ARE LIABLE.

(a) **Election of remedies.** If on account of a disability or death for which compensation is payable under this Act, the person entitled to such compensation determines that some person other than the employer or a person or persons in his employ is liable in damages, he need not elect whether to receive such compensation or to recover damages against such third person.

(b) **Acceptance of compensation acting as assignment.** Acceptance under an award in a compensation order filed by the deputy commissioner of the Board shall operate as an assignment to the employer of all rights of the person entitled to compensation to recover damages against such third person unless such person shall commence an action against such third person within six months after such award.[6]

(c) omitted.

(d) **Institution of proceedings or compromise by assignee.** Such employer on account of such assignment may either institute proceedings for the recovery of such damages or may compromise with such third person either without or after instituting such proceeding.

(e) **Recoveries by assignee.** Any amount recovered by such employer on account of such assignment, whether or not as the result of a compromise, shall be distributed as follows:

(1) The employer shall retain an amount equal to—

(A) the expenses incurred by him in respect to such proceedings or compromise (including a reasonable attorney's

---

**6.** This subsection was amended by Act Sept. 28, 1984 after the debtor's petition was filed. The amendments relate to the reversion of the cause of action to the person entitled to compensation if the employer fails to commence an action within 90 days after the cause of action is assigned.

fee as determined by the deputy commissioner or Board);

 (B) the cost of all benefits actually furnished by him to the employee under section 7 [33 USCS § 907];

 (C) all amounts paid as compensation;

 (D) the present value of all amounts thereafter payable as compensation, such present value to be computed in accordance with a schedule prepared by the Secretary, and the present value of the cost of all benefits thereafter to be furnished under section 7 [33 USCS § 907], to be estimated by the deputy commissioner, and the amounts so computed and estimated to be retained by the employer as a trust fund to pay such compensation and the cost of such benefits as they become due, and to pay any sum finally remaining in excess thereof to the person entitled to compensation or to the representative; and

 (2) omitted

(f) omitted

(g) omitted

(h) **Subrogation.** Where the employer is insured and the insurance carrier has assumed the payment of the compensation, the insurance carrier shall be subrogated to all the rights of the employer under this section.

(i) omitted

With respect to claims paid by the debtors as self-insured employers, the trustee asserts that as of the commencement of the case, the trustee held causes of action to recover damages against third parties because of the statutory assignment. The trustee further asserts that these causes of action were "property of the estate" as defined in § 541 of the Bankruptcy Code. The trustee makes no distinction between his rights with respect to claims paid entirely by the debtor and claims paid in part by the debtor.

Section 541 of the Bankruptcy Code provides that the estate is comprised of "all legal or equitable interests of the debtor in property as of the commencement of the case". This section is not intended, however, to expand the debtor's rights against others more than they exist at the commencement of the case. House Report No. 95–595, 95th Cong. 1st Sess. (1977) 367–8; Senate Report No. 95–989, 95th Cong. 2nd Sess. (1978) 82–3, U.S. Code Cong. & Admin. News 1978, pp. 5787, 5868.

It is elemental that causes of action belonging to the debtor at the commencement of the case are included within the property of the estate. At the time of filing, these actions pass to the trustee, who has the responsibility of asserting them whenever necessary for collection or preservation of the estate. *See In re Ozark Restaurant Equipment Co., Inc.*, 816 F.2d 1222, 1225 (8th Cir.1987). The operative date for determining what property the bankruptcy estate contains and is controlled by the trustee pursuant to § 541 of the Code is the date that the petition is filed. *In re Cook*, 43 B.R. 996, 998 n. 1; *In re Jones*, 43 B.R. 1002, 1004 n. 1 (D.Ind.1984).

Subsequent to the filing of the debtors' petition, however, the payments for the employees' work-related injuries were made by Utica. Utica alleges, and the Trustee does not dispute, that it has been obligated to pay nearly $5 million on account of debtor's employees since the debtor filed its petition. Utica maintains that because of those substantial payments, its right in the fund held by BRI is superior to that of the Trustee.[7] Utica asserts that its rights are founded on the doctrines of reimbursement and subrogation as well as § 33(h) of the LHWCA quoted above. As noted earlier, Utica argues that as an insurance carrier, it is "subrogated to all the rights of the employer under this section [§ 933]". Utica interprets "all the rights" to include the right to assignment of employee claims as to which the debtor has paid all or part of the employee's compensation.

---

**7.** The court notes that the debtors' Schedules and Statement of Financial Affairs reflect total debts in excess of $10.25 million exclusive of the claim by Utica. The breakdown is as follows: Secured—$4,043,365.20; Unsecured—$6,203,-070.10; Taxes—$4,434.96.

 It has not been stipulated or asserted that any of the recoveries from third parties' which together make up the fund in dispute were the result of "awards". Yet it is the acceptance of an "award" that triggers the assignment provision of § 33(b) of the Act. In *Pallas Shipping Agency, Ltd. v. Duris*, 461 U.S. 529, 103 S.Ct. 1991, 76 L.Ed.2d 120 (1983), the United States Supreme Court held that acceptance of voluntary compensation payments by an employee was not acceptance of a formal award in compensation which gave rise to the assignment of his claim under § 33(b) of the Act. The court reasoned as follows:

> The requirement of a formal award was designed to protect the longshoreman from the unexpected loss of his rights against a negligent third party and to permit him to make a considered choice among available remedies ... Congress clearly did not contemplate that the mere acceptance of compensation benefits, in the absence of an award by the Deputy Commissioner, would trigger an immediate assignment of the longshoreman's claim against third persons, for such voluntary payments would not adequately apprise the longshoreman of the election of remedies.

461 U.S. at 536–37, 103 S.Ct. at 1995, 76 L.Ed.2d at 126–27. As noted by Justice Marshall in *Pallas*, "awards" are the exception rather than the rule, this court will not assume that "awards" had been made for compensation or that the assignment provision of § 933(b) was triggered. Accordingly, the court must on the facts conclude that the rights of the trustee or Utica cannot be determined under the provisions of § 33 of the Act. This conclusion does not preclude a determination of the case based upon the undisputed facts nor does it change the results.[8]

Utica argues that the statute (33 U.S.C. § 901 *et seq.*) codifies the common law principles of subrogation and that the dispute before the court can be determined by applying the principles of subrogation. The

court agrees that principles of subrogation as well as other common law principles including indemnification and reimbursement have been applied to cases arising under the Act. *See Pallas Shipping Agency Ltd. v. Duris, supra*, 461 U.S. at 539, 103 S.Ct. at 1996, 76 L.Ed.2d at 128.

In establishing the law of this jurisdiction the court in *The Etna*, 138 F.2d 37, (3rd Cir.1943), discussed not only indemnification, but also the employer's (and insurer's) right to intervene in an employee's action together with the principles of subrogation and reimbursement. It is appropriate, therefore, to review the equitable principles that are relevant. That review can also be made in light of the statute, its purpose and the rights created herein.

The doctrines of reimbursement, indemnification and subrogation are principles of equity that are intertwined and are designed to benefit the surety and, in certain cases, to preclude double recovery by a creditor or claimant. Reimbursement is generally the surety's right to be "paid back" by the principal. Based upon the principal's request that the surety enter into the contract with him, the law implies a promise by the principal to reimburse the surety for the outlays it is required to make by reason of the suretyship. Simpson, *Suretyship*, § 48. Alternatively, the surety can seek indemnification by having the principal exonerate him from payment of the obligation or by having a culpable third party or the principal compensate for the loss. The right of subrogation is a device of equity in aid of the rights of reimbursement and indemnification which courts have found to exist independent of contract. Subrogation is the right of the surety to be substituted to the position of the creditor or claimant that the surety has paid. It is an equitable assignment of the creditor's or claimant's rights to the surety. Simpson, *Suretyship*, § 47. There is no question that Utica has equitable claims in this case.

**8.** Utica's argument that the phrase "all the rights" in § 933(h) extends its right of subrogation to recoveries related to claims of other

"persons" and expands its right to be reimbursed from a recovery more than it paid on a specific claim is without merit.

Utica relies on the decision of the United States Supreme Court in *Pearlman v. Reliance Insurance Co.*, 371 U.S. 132, 83 S.Ct. 232, 9 L.Ed.2d 190 (1962), in support of its contention that all the recoveries are not "property of the estate". *Pearlman* involved the Dutcher Construction Company (Dutcher) which contracted to do work for the United States on a St. Lawrence Seaway project. Under the Miller Act, 40 U.S.C. § 270a, the contractor was required to obtain guarantees that (1) the contract would be performed and (2) persons supplying labor and material to the project would be paid. The defendant, Reliance Insurance Co., provided such guarantees.

In accordance with the contract, the United States withheld a percentage of the monthly payments due to Dutcher. The retainage, $87,737.35, was to be turned over to Dutcher upon completion of job and acceptance by the United States. Before completion, Dutcher experienced financial difficulties and another contractor was employed to finish the project. Because of Dutcher's default, the surety was required to pay approximately $350,000 for labor and materials to complete the job. After the payment by the surety, Dutcher filed bankruptcy and Chester Pearlman was appointed trustee. The retainage was turned over to the trustee but the surety claimed that it had a superior claim to the funds. The Supreme Court addressed the conflicting claims of the trustee and surety and held in favor of the surety. *Pearlman*, 371 U.S. at 141, 83 S.Ct. at 237, 9 L.Ed.2d at 196.

The court referring to its decision in *United States v. Durham Lumber Co.*, 363 U.S. 522, 80 S.Ct. 1282, 4 L.Ed.2d 1371 (1960), noted that it had recently reaffirmed the principle that property rights existing before bankruptcy in persons other than the bankrupt must be recognized and respected in bankruptcy. *Pearlman*, 371 U.S. at 136, 83 S.Ct. at 234, 9 L.Ed.2d at 193. The court then found that the surety was subrogated to the rights of the debtor; the government; and, the laborers and materialmen.

In discussing what property right the surety had in the retainage in *Pearlman* the court stated:

Since there is no statute which expressly declares that a surety does acquire a property interest in a fund like this under the circumstances here, we must seek an answer in prior judicial decisions. Some of the relevant factors in determining the question are beyond dispute. Traditionally sureties compelled to pay debts for their principal have been deemed entitled to reimbursement, even without a contractual promise such as the surety here had. And probably there are few doctrines better established than that a surety who pays the debt of another is entitled to all the rights of the person he paid to enforce his right to be reimbursed. This rule, widely applied in this country and generally known as the right of subrogation, was relied on by the Court of Appeals in this case.

371 U.S. at 136–37, 83 S.Ct. at 235, 9 L.Ed. 2d at 193–94. These subrogation rights were held to be superior to the rights of a trustee in bankruptcy. 371 U.S. at 141–42, 83 S.Ct. at 232, 9 L.Ed.2d at 196.

Utica maintains that the *Pearlman* case completely precludes the trustee from treating any of the third party recoveries held by BRI as "property of the estate". But when that decision is analyzed against the facts of this case, such a wholesale proposition is not warranted. *Pearlman* involved one job and one source of funds. *Pearlman* did not extend to the surety the right of subrogation with respect to funds to which the debtor was entitled from other projects where the surety made no payment.

In this matter, the fund is a pool created with the proceeds from recoveries for injuries to fifty-three (53) employees. The claims of thirty (30) employees were paid entirely by the debtor, twenty-three (23) claims were paid in part by the debtor and in part by Utica. Indeed, the fund has been developed from various sources based on various incidents.

In *Pearlman*, the court relied on the doctrine that "a surety who pays the debt

of another is entitled to all rights of the person he paid to enforce his right to be reimbursed". *Pearlman*, 371 U.S. at 137, 83 S.Ct. at 235, 9 L.Ed.2d at 193–94. In the workers' compensation context, the above doctrine gives the surety the right to pursue individual causes of action against the persons responsible for the injuries to each of the employees that were compensated by the surety.[9] This is a fair proposition. Utica proposes to expand this principle, however, by claiming entitlement to proceeds of recoveries from third parties responsible for injuries to employees who were compensated entirely by the debtor. (Appendix A, Group 1) Furthermore, in those cases where third party recoveries exceed the payment by Utica, Utica claims the excess (Appendix A, Group 2).

The surety also maintains that its rights of subrogation "relate back" to the date of the original suretyship agreement and is therefore superior to the claim of the Trustee. In support of this argument Utica cites *Scarsdale National Bank & Trust Co. v. United States Fidelity & Guaranty Co.*, 264 N.Y. 159, 190 N.E. 330 (1934), where a New York Court of Appeals disallowed a secured lender's claim to withheld funds and turned such funds over to a bonding company. The court stated that the surety's equitable right of subrogation was created when the bond was executed, which was months before the assignment to the secured lender. 264 N.Y. at 163–64, 190 N.E. at 332.

The doctrine that the right of the surety relates back to the surety contract is no doubt deeply rooted in the body of law relating to subrogation. This doctrine, in part, is the rationale that supports decisions which give a surety priority over a creditor that has duly perfected a security interest in assets of the debtor after the date of the surety contract, e.g. *Scarsdale*, or where insolvency occurs post surety contract over the representative of the debtor's estate, e.g. *Pearlman*. The doctrine of relating back has to do with the priority of the surety's right of subrogation, how-

ever, the doctrine does not give rise to the right of subrogation and therein lies the fault in Utica's argument.

In support of his argument that his claim was paramount to the claim of Utica the Trustee relies on *In re Pangori & Sons, Inc.*, 53 B.R. 711 (Bankr.Mich.1985), which is persuasive but not controlling here. In determining the surety's right to indemnification and subrogation, the bankruptcy court relied on Michigan case law and determined that the trustee's status of judicial lien creditor cut off the surety's ability to "relate back" its claim to the surety agreement. *Id.* at 720–21. The bankruptcy court judge relied on a Michigan Court of Appeals case which decided that a garnishing judgment creditor had priority over the claim of a surety to retainage when at the time of garnishment, the surety had not been called upon to pay on its bond.[10]

In addition to analyzing the surety's general rights to indemnification and subrogation, *Pangori* considered the surety's right to be subrogated to the rights of the city. This issue was also determined in favor of the debtor's estate on the basis of Michigan law. Michigan law apparently holds that while the city had the right to withhold funds from a contractor it had no obligation to do so and that the rights of laborers and materialmen were limited to the performance bond. As the surety had not paid debts of the city it was not subrogated to the rights of the city. The surety could only succeed to the rights of the laborers and materialmen, i.e. the rights of general unsecured creditors whose claims may have been entitled to some priority. *Pangori*, 53 B.R. at 721–22.

The result under Michigan law is the exception rather than the rule and is contrary to the rule in *Pearlman*. The result in *Pangori* does, however, reemphasize the broad rule that the rights of creditors, inter se, must be considered in the light of the law of the states.

---

**9.** *See* 33 U.S.C. § 933(h).

**10.** *Earl Dubey & Sons, Inc. v. Macomb Contracting Corp.;* 97 Mich.App. 553, 296 N.W.2d 582 (1980).

Although we are not dealing with the Miller Act or an analysis of subrogation rights under Michigan law, *Pearlman* and *Pangori, supra,* provide insight to the court's analysis of Utica's right to subrogation *vis-a-vis* the trustee's claim to the funds under 11 U.S.C. § 541. The parties disagree on which law should be applied in connection with subrogation under the LHWCA and the text of the Act itself does not provide this court with very much guidance. The trustee maintains that the matter is governed by New Jersey substantive law while counsel for Utica argues that federal common law principles of subrogation, as codified by the LHWCA, should be applied.

The decision to adopt state law or to fashion a nationwide federal rule is a matter of judicial policy which is dependent upon a variety of considerations always relevant to the nature of the specific governmental interests and to the effects upon them of applying state law. *United States v. Kimbell Foods, Inc. et al.,* 440 U.S. 715, 728–29, 99 S.Ct. 1448, 1458, 59 L.Ed.2d 711, 723–24 (1979) *citing United States v. Standard Oil Co.,* 332 U.S. 301, 310, 67 S.Ct. 1604, 1609, 91 L.Ed. 2067, 2073 (1947). In addition to uniformity, the court must consider whether the application of state law would frustrate the specific objectives of federal programs and the extent to which application of a federal rule would disrupt commercial relationships predicated on state law. *United States v. Kimbell Foods, Inc., supra,* 440 U.S. at 729–30, 99 S.Ct. at 1458–59, 59 L.Ed.2d at 724–25.

There is no need for uniform standards of subrogation under the LHWCA. The manifest purpose of the Act is to provide an injured maritime worker with prompt and certain compensation benefits from the employer even where the employer is not to blame for the accident. *Peters v. No. River Ins. Co. of Morristown, N.J.,* 764 F.2d 306, 310 (5th Cir.1985). A nationwide precept establishing the time when an equitable lien is established is not necessary to achieve such a purpose. In fact, as a matter of bankruptcy law, state law usually governs conflicts between lienholders competing for the same property. *In re*

*Key West Restaurant and Lounge, Inc.,* 54 B.R. 978, 986 (Bankr.Ill.1985); *In re Alta Industries, Inc.,* 53 B.R. 567, 569 (Bankr.Tex.1985).

Section 541 of the Bankruptcy Code has already been discussed in some detail. Equally important is 11 U.S.C. § 544(a)(1), which gives the Trustee the rights and powers of a judicial lien creditor as of the date of bankruptcy. The Code also gives the Trustee the powers of a creditor with a writ of execution that is returned unsatisfied on the date the petition is filed. 11 U.S.C. § 542. In order to determine the extent of these powers, state law must be consulted to ascertain whether a particular transfer or obligation is voidable by such creditors. *See In re Ireland,* 14 B.R. 849 (M.D.La.1981); *In re Silverman,* 2 B.R. 326 (Bankr.N.J.1980), *rev'd and remanded on other grounds,* 6 B.R. 991 (D.N.J.1980).

Utica rivals the claim of the Trustee to the funds under § 544 by the doctrine of subrogation, which has long been recognized in the State of New Jersey. *See e.g. Coudert v. Coudert,* 43 N.J.Eq. 407, 5 A. 722 (Ch.1887); *Gaskill v. Wales,* 36 N.J.Eq. 527 (E. & A. 1883). It has been recognized that where a surety has paid a debt, he may not only call upon the principal to reimburse him, but for the purpose of obtaining indemnity from the principal, he is at once subrogated to all of the rights, remedies and securities of the creditor. *Irick v. Black and Lippincott,* 17 N.J.Eq. 189, 195 (Ch.1864). Furthermore, subrogation is a highly favored remedy in this state, one which courts are inclined to extend rather than restrict. *See Bater v. Cleaver,* 114 N.J.L. 346, 353, 176 A. 889 (E. & A. 1934).

New Jersey's common law of subrogation, however, also recognizes rules and limitations. For example, the court in *Receivers of New Jersey Midland Railway Co. v. Wortendyke,* 27 N.J.Eq. 658 (E. & A. 1876), stated: "The right of subrogation cannot be enforced until the whole debt is paid ..." *Id.* at 661. Another New Jersey court has declared the general rule to be that a subrogee is entitled to indemnity

only to the extent of money actually paid to discharge the obligation. *Colonial Penn Insurance Co. v. Ford*, 172 N.J.Super. 242, 243, 411 A.2d 736 (Law Div.1979) *citing Memphis & L.R.R. Co. v. Dow*, 120 U.S. 287, 7 S.Ct. 482, 30 L.Ed. 595 (1886). Furthermore, the rights of a subrogee attach at the time the equities arise in his favor, which is ordinarily at the time he assumes and pays the debt. *Matter of Morse*, 8 B.R. 990, 994 (Bankr.N.J.1981); *Montefusco Excavating and Contracting Co. v. Middlesex County*, 82 N.J. 519, 528, 414 A.2d 961 (1980). Finally, it has been recognized that *pro tanto* subrogation may be decreed where justice so requires. *Comins v. Culver*, 35 N.J.Eq. 94 (Ch.1882).

New Jersey is quite obviously in the mainstream with respect to the corollaries relating to the principle of subrogation and in accord with the federal application of those corollaries. Considering the vintage of most of the above cited cases, the state courts have been there for some time. A more recent case on point in New Jersey is *Stevlee Factors, Inc. v. State*, 136 N.J.Super. 461, 346 A.2d 624 (Ch.Div.1975). The facts of that case were quite similar to those in *Pearlman v. Reliance Insurance Co., supra.* Indeed, plaintiff Stevlee Factors, Inc. held a perfected security interest in the accounts receivable of Dean Electric Co., who performed electrical work for the State of New Jersey. By statute, Dean was required to file surety bonds to secure payment of materialmen and laborers and to insure performance of the contracts. Pursuant to contract, the State withheld 10% of the monies earned by Dean per month which totalled $94,878.00. Dean made an assignment for the benefit of creditors and ceased work under the above-referenced contracts. The State applied the 10% retainage to complete seven (7) contracts which were left unfinished by Dean. The sureties agreed to contribute the difference between the retainage amount and the costs of the completion.

█ Plaintiff maintained that due to the perfected security interest, it had a superior claim to the retainage. The court, however, disagreed based upon the following reasoning:

The sureties' right to the fund rests upon the application of this doctrine. [subrogation] Since the sureties stand in the place of those whose claims they have paid, the funds must be paid to the sureties just as the funds would have gone in the absence of a bond, to the labor and materialmen rather than to the general creditors. [citations omitted]

136 N.J.Super. at 466, 346 A.2d 624.

The court also found that the surety's right of subrogation was not impaired by the filing requirements of the Uniform Commercial Code. The court reasoned that although rights of subrogation grow out of contracts, they do not depend on a contract for their existence but are created by law to avoid injustice. *Id.* at 466–67, 346 A.2d 624 *citing Jacobs v. Northeastern Corp.*, 416 Pa. 417, 206 A.2d 49 (Sup.Ct.1965). This court is of the opinion that its treatment of the recoveries by BRI on an individual claim basis is in accord with New Jersey's subrogation laws discussed supra.

Appendix A annexed to the opinion categorizes the claims into three separate groups. That grouping has been done as a matter of convenience in arriving at the rights of the parties to the recovery fund. Group 1 consists of those third party recoveries relating to claims paid in full by the debtor. Group 2 and Group 3 include recoveries on claims that have been paid in part by Utica and in part by the Debtors. The recoveries on each claim in Group 2 exceed the payment made by Utica. The recovery on each claim in Group 3 is less than the payments by Utica. It is the opinion of this court that the rights of the trustee and Utica must be determined claim by claim. This is true because each recovery by BRI flowed from the rights of the debtor or the individual employees who received compensation by reason of the LHWCA. The claim by claim analysis is also necessary because as to each claim the injured employee would have the right to the excess of the recovery over the claim paid and the cost of recovery. This is true whether a recovery is obtained because of

an assignment under § 33(b) of the Act or common law.

Not every compensation claim paid to an employee by the debtor and Utica is the result of the negligence of, and does not result in a claim against, a third party. This is clear from the facts that are not in dispute. Utica alleged total payments to debtors' employees of $4,817,422.97 and it is not disputed. However, as reflected in Appendix A (Column 5) Utica's payments to the employees on account of the claims that generated recoveries from third parties total $293,402.00. It has been represented to the court by counsel for Utica that the recoveries enumerated in the Affidavit of Dennis M. Sweeny (and thereby included in Appendix A) represent all third party recoveries.

Addressing Group 1 on Appendix A it is the opinion of the court that Utica has no right to any of the recoveries in this group, where all of the employees' claims were paid by the debtor pre-bankruptcy. By reason of the claim payments the debtor had a bundle of rights available to it if the injuries to the employee were caused in whole or in part by the negligence of a third party. *See The Etna,* 138 F.2d 37 (3d Cir.1943). Independently of any right of its employee, the debtor could seek indemnification from the third party. It could intervene in an action commenced by the employee or alternatively seek reimbursement from the employee from the employee's recovery. Finally, if the employee took no action against the third party, the debtors could, by way of subrogation, initiate the action against the third parties. This bundle of rights, held by the debtors at the time they filed petitions for relief, fits within the definition of 11 U.S.C. § 541 as property of the estate.

Utica's argument with respect to this first group fails for several reasons. Utica had no right by way of subrogation, indemnification or reimbursement with respect to any of the employees' in this group. Utica made no payments to the employees who

had the third party claims and therefore, there is no equitable basis to allow Utica to stand in the place of the employee. *Pearlman* and *Scarsdale, supra,* are not relevant as there is no right with respect to these recoveries that could relate back to the date that Utica contracted to act as surety for the debtor's obligations. What Utica seeks to do is to divert this part of the fund from the debtor's estate to the detriment of other creditors. Such a result would frustrate the statutory scheme of the assets of an estate adopted by Congress in § 726 of the Bankruptcy Code. The hard fact that Utica has been required to pay nearly $5 million in compensation claims does not warrant changing established law relating to subrogation. The recoveries totaling $101,076.16 on account of the third party claims of employees included in Group 1 as to which Utica made no payment are, therefore, property of the estate.

With respect to the recoveries on the claims classified by the court as Groups 2 and 3 both Utica and the debtors made payments to those employees. Both Utica and the debtor, therefore, had equitable rights with respect to the recoveries.

Addressing first the rights of the debtor, the court finds that at the time of the filing of the petition the debtors' rights to be subrogated to the rights of the employees against third parties had not matured. As noted earlier, the right of subrogation, generally arises only when the creditor has been fully paid.[11] As none of the claims of the employees included within Groups 2 and 3 on Appendix A were fully paid, the debtors right to be subrogated to employee claims against third parties had not matured. While the debtors had equitable rights to reimbursement and indemnification, the remedy of subrogation to enforce those rights was not available to the debtors.

The court finds that the payments by Utica resulted in the satisfaction in full

---

**11.** *See e.g. Receivers of New Jersey Midland Railway Co. v. Wortendyke,* 27 N.J.Eq. 658 (E. & A. 1876).

of the obligation to each of the employees in Groups 2 and 3. Utica was then entitled to be subrogated to the right of each employee that it had paid with respect to the employee's rights against the debtor and third parties. With respect to these rights Utica, as surety, has the right to recoup what it has paid to each employee but no more. *American Surety Co. v. Bethlehem National Bank*, 314 U.S. 314, 317, 62 S.Ct. 226, 228, 86 L.Ed. 241, 244 (1941).

Applying that principle of subrogation to the third party recoveries in Group 2, Utica is entitled to be paid $167,889.00. This makes Utica whole with respect to the payments it has made to those employees. The balance of the recoveries applicable to this group of employees is $250,910.00 which is to be paid to the Trustee as property of the estate. While at first blush the relationship of the trustee's recovery to the payments of $726,401.00 made by the debtor might seem inequitable. The allocation recognizes that the surety's right to reimbursement is entitled to priority over the right of the principal. The allocation further results in the cost of compensation falling upon the party responsible for that obligation.

Applying the same principles to the third party recoveries for the employees in Group 3, Utica is entitled to receive $62,307.00. With respect to each employee the recovery from third parties was less than the amount that Utica became obligated to pay. It follows, therefore, that Utica is entitled to the full amount of the third party recovery received on account of each employee in this group.

The result in this case is in accord with *Western Casualty and Surety Company v. Brooks*, 362 F.2d 486 (4th Cir.1966). In that case there was two separate bonds and two separate retainage funds. The surety was not permitted to apply the excess of one fund over the surety's payment against the excess of the surety's payment over the second, but distinct fund. *Id.* at

491. While Utica asserts that *Western Casualty* stands for the proposition that a surety cannot aggregate bonds to offset losses, the decision in the case did not rest on the existence of separate bonds. *Western Casualty* was decided rather on the fact that the surety had the right of subrogation against two separate and distinct funds and that the recovery from each fund was limited to the payments related to each separate and distinct project.[12]

In Summary the result of the court's determination is as follows:

| | Total | Utica | Trustee |
|---|---|---|---|
| Group 1 | 101,076.16 | –0– | 101,076.00 |
| Group 2 | 418,799.15 | 167,889.00 | 250,910.00 |
| Group 3 | 62,037.02 | 62,037.02 | |
| | 581,912.33 | 229,926.02 | 351,981.00 |

To the extent that Utica is not made whole from third party recoveries it is nevertheless entitled to be subrogated to the employee's claim for compensation from the debtors. These claims will share pro rata with the claims of other creditors of the debtors. This result is in the opinion of the court more equitable than that advanced by Utica in its moving papers which would have Utica recover a fund of $581,912.33 when the payments by Utica amounted to $293,402.00 of the total of $1.6 million paid on account of those claims.

To the extent that Utica has had the use of the funds that are the property of the estate. Utica shall pay interest on those funds from the date that the trustee made demand for the funds or the date that Utica received such funds, whichever is later. The rate of interest shall be the average rate of interest earned by Utica on its investment portfolio for the period it has had the use of those funds.

The court notes in the Affidavit of Dennis M. Sweeney that reserves are required with respect to employee claims in Groups 2 and 3. The trustee will receive $39,345.00 applicable or available for the required reserve and shall hold that amount

12. The court stated at page 491, "Each contract and each bond was executed separately; each applied to a separate road construction job in a different county; and the retained funds on each project were separate and distinct. The doctrine of subrogation arises out of the unpaid debts on each contract; relates back in time to the execution of that specific bond; and is limited in scope to the debts arising under one contract."

**648**

in a separate fund. Utica may apply to the court for reimbursement for payments made to the employee for whom reserve has been established.

Counsel for the trustee shall submit an order consistent with the foregoing opinion.

APPENDIX A

| | (1) RECOVERY AMOUNT | (2) CLAIM # | (3) CLAIM PAID | (4) PAID BY SEALAND | (5) BY UTICA |
|---|---|---|---|---|---|
| | 1,200. | 1816018 | 3,642. | 3,642. | --0-- |
| | 5,000. | 1816310 | 15,182. | 15,182. | --0-- |
| | 167. | 1816563 | 5,366. | 5,366. | --0-- |
| | 567. | 1816014 | 24,600. | 24,600. | --0-- |
| | 500. | 1800204 | 6,195. | 6,195. | --0-- |
| | 2,500. | 1800246 | 7,305. | 7,305. | --0-- |
| | 3,667. | 1793363 | 9,310. | 9,310. | --0-- |
| | 4,167. | 1793361 | 5,803. | 5,803. | --0-- |
| | 11,607. | 1793362 | 17,411. | 17,411. | --0-- |
| | 6,417. | 1805913 | 67,978. | 67,978. | --0-- |
| | 4,000. | 1800419 | 29,461. | 29,461. | --0-- |
| GROUP 1 | 1,500. | 1794340 | 42,439. | 42,439. | --0-- |
| | 7,500. | 1800207 | 12,569. | 12,569. | --0-- |
| | 5,000. | 1820353 | 11,904. | 11,904. | --0-- |
| | 1,312. | 1830024 | 1,750. | 1,750. | --0-- |
| | 3,000. | 1800422 | 21,999. | 21,999. | --0-- |
| | 2,500. | 1820254 | 13,777. | 13,777. | --0-- |
| | 1,000. | 1816316 | 2,522. | 2,522. | --0-- |
| | 750. | 1800328 | 14,011. | 14,011. | --0-- |
| | 4,572. | 1820102 | 5,273. | 5,273. | --0-- |
| | 4,667. | 1830179 | 19,665. | 19,665. | --0-- |
| | 567. | 1830167 | 2,829. | 2,829. | --0-- |
| | 1,400. | 1830322 | 3,992. | 3,992. | --0-- |
| | 8,333. | 1800293 | 9,926. | 9,926. | --0-- |
| | 2,000. | 1830120 | 16,308. | 16,308. | --0-- |
| | 4,000. | 1816059 | 5,010. | 5,010. | --0-- |
| | 600. | 1816071 | 4,369. | 4,369. | --0-- |
| | 1,500. | 1820192 | 4,622. | 4,622. | --0-- |
| | 2,750. | 1800003 | 44,394. | 44,394. | --0-- |
| | 8,333. | 1820024 | 20,629. | 20,629. | --0-- |
| SUB TOTAL | 101,076. | | 450,241. | 450,241. | --0-- |
| | 7,000. | 1830243 | 10,148. | 9,650. | 498. |
| | 21,000. | 1805910 | 57,934. | 57,307. | 627. |
| | 5,844. | 1816427 | 49,875. | 49,470. | 405. |
| | 52,003. | 1793870 | 125,946 | 109,436. | 16,510. |
| | 72,057. | 1800147 | 98,814. | 82,787. | 16,027. |
| GROUP 2 | 57,630. | 1793571 | 132,837. | 123,711. | 9,126. |
| | 89,469. | 1793902 | 147,813. | 61,709. | 86,104. |
| | 37,500. | 1816419 | 97,884. | 94,380. | 3,504. |
| | 13,333. | 1820321 | 24,086. | 17,453. | 6,633. |
| | 3,500. | 1830391 | 6,160. | 5,318. | 842. |
| | 20,000. | 1816402 | 31,853. | 18,757. | 13,096. |
| | 14,961. | 1830389 | 24,477. | 15,812. | 8,665. |
| | 24,500. | 1800202 | 86,463. | 80,611. | 5,852. |
| SUB TOTAL | 418,799. | | 894,290. | 726,401. | 167,889. |
| | 5,208. | 1816401 | 72,744. | 48,967. | 23,777. |

| | | | | | |
|---|---|---|---|---|---|
| | 1,000. | 1830198 | 16,368. | 9,556. | 6,812. |
| | 500. | 1830059 | 10,511. | 7,011. | 3,500. |
| GROUP | 2,000. | 1820367 | 7,522. | 4,879. | 2,643. |
| 3 | 2,000. | 1800104 | 24,116. | 13,766. | 10,350. |
| | 8,333. | 1830284 | 15,169. | 6,782. | 8,387. |
| | 25,496. | 1820217 | 102,855. | 64,789. | 38,066. |
| | 10,000. | 1830012 | 33,195. | 13,064. | 20,131. |
| | 2,500. | 1830299 | 7,447. | 2,936. | 4,511. |
| | 5,000. | 1830364 | 10,182. | 2,846. | 7,336. |
| SUB TOTAL | 62,037. | | 300,109. | 174.596. | 125,513. |
| TOTALS | 581,912. | | 1,644,640. | 1,351,238. | 293,402. |