In re ALLEGHENY HEALTH, EDUCATION AND RESEARCH FOUNDATION, et al., Debtors.

Acordia of West Virginia, Inc., Plaintiff,

v.

William J. Scharffenberger as Chapter 11 Trustee of Allegheny Health, Education and Research Foundation and formerly affiliated hospitals Allegheny University Hospital–Centennial, Hahnemann University Hospital, Medical College of Pennsylvania Hospital, City Avenue Hospital, Allegheny University Hospital–Elkins Park, St. Christopher's Hospital; Travelers Insurance Company; Tenet Health System Philadelphia, Inc.; and West Penn Allegheny Health System, Inc., Defendants/Claimants.

Bankruptcy No. 98–25773–MBM.
Adversary No. 02–2129–MBM.

United States Bankruptcy Court, W.D. Pennsylvania.

July 9, 2004.

Jeffrey J. Ludwikowski, McGuire Woods, LLP, Pittsburgh, PA, for the Chapter 11 Trustee.

Gary P. Nelson, Sherrard, German & Kelly, Pittsburgh, PA, for West Penn Allegheny Health System.

James T. Tallman, Metz Lewis, Pittsburgh, PA, for Acordia of West Virginia.

### MEMORANDUM OPINION

M. BRUCE MCCULLOUGH,
Bankruptcy Judge.

Acordia of West Virginia, Inc. (hereafter "Acordia"), plaintiff herein, in its particular capacity as the administrator of the self-insured workers' compensation program of former employees of the instant debtors (hereafter collectively referred to as "AHERF"), presently holds a sum of

money totaling $817,149.04 and anticipates the receipt of future funds as well, all of which Acordia acknowledges is owned by someone other than itself (hereafter "the Disputed Funds"). As a consequence, Acordia commenced the instant adversary proceeding in the nature of a statutory interpleader action and identified as potential claimants of the Disputed Funds each of the defendants that are named in the above caption, that is the Chapter 11 Trustee for AHERF (hereafter "the Trustee"), West Penn Allegheny Health System, Inc. (hereafter "West Penn"), Travelers Insurance Company (hereafter "Travelers"), and Tenet Health System Philadelphia, Inc. (hereafter "Tenet"). On June 9, 2004, the Court granted leave to Acordia to amend its pending complaint so as to name four subsidiaries of West Penn as additional defendants/claimants, namely Allegheny General Hospital, Allegheny Singer Research, Inc., Allegheny University Medical Centers, and AUMC/Canonsburg Ambulance Service, Inc.

The Trustee and West Penn each claim that they are entitled to all of the Disputed Funds, while Travelers and Tenet have disclaimed any interest therein. West Penn, on behalf of its four subsidiaries, also argues that, if it is not entitled to all of the Disputed Funds, then some of its four subsidiaries are entitled to the entirety of such funds.

On January 14, 2004, the Trustee and West Penn jointly filed with the Court a document entitled "Stipulated Record" (hereafter "the Stipulated Record"), wherein the Trustee and West Penn stipulated as to "the sum and substance of testimony that would be offered by [their]

witnesses in the event of an actual trial of this matter [ (i.e., the interpleader action regarding entitlement, as between the Trustee and West Penn, to the Disputed Funds) ]." Stip. R. at p. 2. On March 23, 2004, after they each filed briefs and reply briefs, the Trustee and West Penn jointly certified to the Court that the instant matter was ready for oral argument or immediate resolution by the Court. To better enable West Penn to argue alternatively that its subsidiaries are entitled to all of the Disputed Funds, West Penn, on April 15, 2004, moved to supplement the Stipulated Record (hereafter "the Motion to Supplement"). The Trustee opposes the Motion to Supplement.

The instant decision resolves, at least in part, who, as between the Trustee, West Penn, and West Penn's subsidiaries, is entitled to the Disputed Funds. The instant decision also resolves the Motion to Supplement.

### STATEMENT OF FACTS [1]

Prior to filing for bankruptcy on July 21, 1998, AHERF self-insured its liability for, and thus satisfied directly on its own, any claims that were levied against it by its employees for workers' compensation due under Pennsylvania's Workers' Compensation Act. Because AHERF so self-insured, it was required by Pennsylvania law to post a surety bond in favor of the Commonwealth of Pennsylvania (hereafter "the Commonwealth")—in particular, Pennsylvania's Bureau of Workers' Compensation, Department of Labor and Industry—to secure the payment of AHERF's workers' compensation obligations. AHERF obtained such a surety bond from Travelers [2] effective as of January 1, 1988

---

1. Unless otherwise indicated, each of the facts as set forth below is taken directly from the Stipulated Record.

2. The surety on the Surety Bond was actually Aetna Casualty and Surety Company, a predecessor of Travelers.

(hereafter "the Surety Bond").[3] Listed as principals on the Surety Bond in addition to AHERF were three entities then owned by AHERF which ultimately did not follow AHERF into bankruptcy, including, in particular, Allegheny General Hospital (hereafter "AGH") and Allegheny Singer Research, Inc. (hereafter "Singer"). *See* Stip. R. Ex. B.

AHERF and certain of its nonbankrupt affiliated entities executed several contracts of indemnity with Travelers at various times on or prior to August 20, 1997, whereby AHERF and such entities agreed to indemnify Travelers in full for any obligations that Travelers might incur were Travelers called upon by the Commonwealth to perform under the Surety Bond (hereafter "the Indemnity Agreements"). Included among such affiliated entities were AGH, Singer, and Allegheny University Medical Centers (hereafter "AUMC"). Each of the Indemnity Agreements provides, *inter alia*, that "the Indemnitors [(i.e., AHERF, AGH, Singer, and AUMC)] need not be notified of … [t]he release by … [Travelers], on terms satisfactory to it, of any of the Indemnitors." *See* Stip. R. Ex. C (Indemnity Agmts. ¶¶ 4 or 5). AHERF ceased satisfying workers' compensation claims after July 21, 1998, and the Commonwealth, by letter dated March 9, 1999, called upon Travelers to perform under the Surety Bond.

West Penn was formed on November 12, 1999, for the purpose of serving as the sole member (i.e., parent) of a health system subsequently formed in August 2000, which system is comprised of (a) components of the former West Penn Healthcare System, Inc., and (b) components of the former The Healthcare Alliance for Western Pennsylvania, Inc. (hereafter "the Healthcare Alliance"). The Healthcare Alliance was formed on June 8, 1999, to serve as the sole member (i.e., parent) of AGH, Singer, and AUMC, in substitution for AHERF,[4] and so as to effectuate the Trustee's bankruptcy sale of the nonbankrupt affiliates AGH, Singer, and AUMC by way of an agreement dated June 30, 1999, which latter agreement was approved by this Court on July 23, 1999 (hereafter "the June 30, 1999 Agreement"). Pursuant to paragraph 2.7 of the June 30, 1999 Agreement, neither the Healthcare Alliance nor its components, by virtue of a transfer of assets from AHERF to such entities at that time as was specifically contemplated in such agreement, obtained, *inter alia*, any of AHERF's receivables, be they accounts or other amounts that were then due or that might become due in the future.

On June 1, 1999, Travelers commenced an action against AGH, Singer, AUMC, and AUMC/Canonsburg Ambulance Service, Inc. (hereafter "Ambulance") for the purpose of obtaining the various remedies due Travelers under the Indemnity Agreements (hereafter "the June 1, 1999 Litigation").[5] West Penn was not named as a party defendant in such litigation, which fact is not surprising since West Penn was not even formed until approximately six months after June 1, 1999. Moreover,

---

**3.** Another surety bond was issued for an AHERF affiliated entity on July 1, 1985. Because that surety bond was terminated for all workers' compensation liabilities occurring on or after January 1, 1989, it will not be referred to further.

**4.** The Healthcare Alliance was substituted in place of AHERF on August 1, 1999.

**5.** Although Ambulance is named as a party defendant in the June 1, 1999 Litigation, the Court is not aware that Ambulance ever executed an indemnity agreement in favor of Travelers by which Travelers could have sought recovery from Ambulance.

West Penn did not in any fashion become legally obligated to Travelers until August 30, 2001, when (a) West Penn, along with AGH, Singer, AUMC, and Ambulance, entered into an agreement with Travelers that served to settle the June 1, 1999 Litigation (hereafter "the August 30, 2001 Agreement"), (b) West Penn, as part of, and so as to induce Travelers to enter into, the August 30, 2001 Agreement, executed by itself an indemnification agreement in favor of Travelers on terms substantially similar to the Indemnity Agreements to which AGH, Singer, and AUMC were already parties, and (c) West Penn, as part of the August 30, 2001 Agreement, thus agreed to assume and discharge all losses incurred by Travelers on the Surety Bond, including a stipulated loss amount equal to $7,959,367.34. West Penn, as part of the August 30, 2001 Agreement, also agreed henceforth to assume responsibility for any future workers' compensation claims and related obligations that otherwise would be covered under the Surety Bond.

According to paragraph 36 of the Stipulated Record, West Penn rather than its subsidiaries, that is AGH, Singer, AUMC, and Ambulance, satisfied (a) Travelers' indemnification claim as of August 30, 2001, including, *inter alia,* the $7,959,367.34 amount, and (b) the future workers' compensation obligations that West Penn assumed from Travelers as part of the August 30, 2001 Agreement. By virtue of said paragraph 36, the Trustee and West Penn agree that, had there been a trial, witnesses would have testified, with respect to the issue of who paid off such indemnification claim of Travelers and such obligations assumed from Travelers (hereafter collectively referred to either as "Travelers' Indemnification Claim" or "the Indemnification Obligation to Travelers"), to nothing other than that West Penn rather than its subsidiaries satisfied Travelers' Indemnification Claim. Paragraph 36 of the Stipulated Record notwithstanding, West Penn brings the Motion to Supplement so as to introduce at this time evidence to the effect that West Penn's subsidiaries, that is AGH, Singer, AUMC, and Ambulance, rather than West Penn, actually satisfied Travelers' Indemnification Claim. Such motion represents a clear effort by West Penn to argue alternatively that, if it is not entitled to all of the Disputed Funds, then some of its four subsidiaries are so entitled. The Trustee opposes such motion. The Court shall deny the Motion to Supplement for several reasons. First, and despite the contrary pleas of West Penn, the Stipulated Record itself precludes a nonconsensual attempt by West Penn to supplement the record of evidence that the Court can consider to resolve the instant matter. The Court concludes as it does because, quite simply, the Stipulated Record is a fully-executed, final agreement between the parties that does not allow for unilateral, nonconsensual modifications of the same. Second, and the contrary pleas of West Penn notwithstanding, a procedural vehicle does not exist whereby the record of a proceeding can be amended subsequent to the close of trial—the preceding is significant because, and as West Penn appears to recognize, the instant matter is, due to the presence of the Stipulated Record, at the post-trial stage. West Penn argued at the May 18, 2004 hearing regarding the Motion to Supplement that Fed.R.Civ.P. 52(b), made applicable to the instant matter by Fed. R.Bankr.P. 7052, provides, by analogy, support for such motion. Fed.R.Civ.P. 52(b) permits a party to move the Court, subsequent to the close of trial, to supplement its factual findings, that is to make additional findings. However, and unfortunately for West Penn, (a) the supplementation of factual findings by a Court is not, in any sense, equivalent to the supplementa-

tion of a trial record from which such findings emanate, and (b) Fed.R.Civ.P. 52(b) thus does not provide a procedural vehicle whereby the trial record itself may be supplemented. Therefore, Fed. R.Civ.P. 52(b) does not provide any analogous support for the Motion to Supplement. Third, and perhaps most importantly, the Court concludes ultimately that (a) West Penn itself is entitled to some portion of the Disputed Funds, *see infra* pp. 72 & 76, (b) West Penn's subsidiaries, even were the Court to grant the Motion to Supplement, are not, in any event, entitled to a larger share of the Disputed Funds than is West Penn itself, *see infra* pp. 73 & 79, and (c) West Penn thus does not benefit by, and therefore, of course, need not access, its alternative position that some of its subsidiaries rather than itself are entitled to the Disputed Funds. Because West Penn need not access such alternative position, and since West Penn's only motive in bringing the Motion to Supplement is to enable it to access such position, the Motion to Supplement is thereby rendered moot. In light of the foregoing, the Motion to Supplement is **DENIED WITH PREJUDICE** and the Court accordingly finds that West Penn rather than its subsidiaries, that is AGH, Singer, AUMC, and Ambulance, satisfied Travelers' Indemnification Claim including, *inter alia*, the $7,959,367.34 amount.

Travelers filed a proof of claim in the instant bankruptcy case in order to recover on its claim for indemnification pursuant to the Indemnity Agreements as against AHERF. On February 27, 2001, by virtue of this Court's entry of a stipulation and agreed order, AHERF and Travelers settled all pre- and post-petition claims that Travelers asserted in the instant bankruptcy case (hereafter "the February 27, 2001 Agreement"). While Travelers, as part of the February 27, 2001

Agreement, retained its right to recover on its indemnification claim from parties other than AHERF, *see* Stip. R. Ex. F ¶ 7, Travelers waived (a) all claims that it possessed against AHERF save for an allowed general unsecured claim and an allowed administrative expense claim, which two latter allowed claims were "non-duplicative of any other [pre-settlement] claim," *see* Stip. R. Ex. F ¶¶ 1 & 2, and (b) any right as against AHERF that it possessed regarding its waived indemnification claim, *see* Stip. R. Ex. F ¶ 7.

Between March 9, 1999, which is when Travelers commenced answering for AHERF pursuant to the Surety Bond, and August 30, 2001, which is when West Penn assumed Travelers' obligations under the Surety Bond, Acordia, on behalf of Travelers, administered AHERF's self-insured workers' compensation program. In such capacity, Acordia, as of October 2002, has received certain workers' compensation refunds totaling $817,149.04, or, as referred to earlier herein, the Disputed Funds; as well, Acordia continues to receive additional similar refunds. All of the Disputed Funds pertain to workers' compensation claims that were previously paid to former employees of AHERF; put differently, none of the Disputed Funds pertain to workers' compensation claims that were previously paid to employees of AGH, Singer, AUMC, or Ambulance. Additionally, Travelers, and then West Penn after August 30, 2001, never satisfied workers' compensation claims for employees other than those of AHERF—i.e., Travelers and West Penn never paid claims of employees for any of the entities that ultimately became subsidiaries of West Penn.

$634,475.06 of the Disputed Funds represent refunds received from Pennsylvania's Workmen's Compensation Supersedeas Fund. $38,059.54 of the Disputed Funds represent attorney refunds, which are

funds that attorneys paid to Acordia after first recovering them either in subrogation actions or for other overpayments. $2,365.77 of the Disputed Funds represent provider refunds, which are funds that providers paid to Acordia on account of payments originally made to claimants in error (either duplicate payments or payments to an incorrect claimant). $142,248.67 of the Disputed Funds represent one excess insurance carrier refund that Acordia received from AHERF's excess insurance carrier.

According to paragraph 59 of the Stipulated Record, Acordia's accounting records show that $548,507.62 of the Disputed Funds are traceable to workers' compensation claims that AHERF itself paid prior to July 21, 1998, which date is when AHERF ceased paying such claims, while $125,030.70 of such refunds pertain to workers' compensation claims that were paid by Travelers or West Penn.[6] Such stipulation notwithstanding, in footnote 9 to West Penn's reply brief dated March 19, 2004, West Penn (a) disagrees with such attribution of the Disputed Funds by Acordia, and (b) further asserts that such attribution by Acordia is "not part of the [S]tipulated [R]ecord or otherwise a matter of record in the Bankruptcy Case." That such attribution by Acordia is not a part of the Stipulated Record is a mystifying assertion by West Penn given that such attribution is conspicuously set forth in paragraph 59 of the Stipulated Record. Perhaps West Penn means to argue nothing more than that it disagrees with, and is not bound by, such attribution by Acordia since, as the Court construes the Stipu-

lated Record, that such attribution is contained within the Stipulated Record means nothing more than that the same would have been introduced as evidence at trial had there been one. *See supra* pp. 73 & 79. Unfortunately for West Penn, the Stipulated Record and accompanying exhibits constitute the entirety of the record upon which this Court will resolve the instant adversary proceeding, and West Penn has not, through the Stipulated Record or such exhibits, either discredited such attribution by Acordia or provided independent evidence as to the correct attribution. That being the case, the Court accepts as true and accurate such attribution by Acordia.

Acordia's accounting records are insufficient to allow it to assign the remaining $1,362.05 of the Disputed Funds—not counting the excess insurance carrier refund—as between claims paid by AHERF and those that were paid by Travelers or West Penn. Acordia also has not attempted to similarly attribute the $142,248.67 excess insurance carrier refund.

### DISCUSSION

West Penn claims that it is entitled to all of the Disputed Funds and advances in support of such claim what it appears to contend are two discrete reasons. First, West Penn argues that, consistent with the U.S. Supreme Court's decision in *Pearlman v. Reliance Insurance Co.*, 371 U.S. 132, 83 S.Ct. 232, 9 L.Ed.2d 190 (1962), all of the Disputed Funds constitute West Penn's property rather than that of AHERF's bankruptcy estate. Second, West Penn asserts that it is entitled to the en-

---

**6.** According to paragraph 59 of the Stipulated Record, $125,030.70 of the Disputed Funds relate to workers' compensation claims that were paid by West Penn. The Court presumes that what the parties really mean by virtue of such stipulation is that such amount is actually attributable to such claims that were paid

by either Travelers or West Penn given that the purpose of the attribution which is the subject of such stipulation is to isolate what portion of the Disputed Funds pertain to claims paid by AHERF, on the one hand, and to claims paid by both Travelers and West Penn, on the other hand.

tirety of the Disputed Funds by virtue of an application of the equitable doctrine of subrogation.

The Court concludes that West Penn's multiple grounds for its entitlement to the Disputed Funds actually reduce to but one ground, namely that West Penn is entitled to the Disputed Funds by way of equitable subrogation. The Court concludes as it does since (a) the U.S. Supreme Court in *Pearlman* held nothing more than that the equitable interest in property that would otherwise be owned by a debtor but for the subrogation rights of another in such property does not, precisely because of such subrogation rights, constitute property of such debtor's bankruptcy estate, *see Pearlman*, 371 U.S. at 141, 83 S.Ct. at 237, and (b) the *Pearlman* decision thus does not support West Penn's position unless West Penn possesses subrogation rights with respect to the Disputed Funds.

■ Notably, West Penn does not argue at any point that any basis other than subrogation exists whereby it rather than AHERF is entitled to the Disputed Funds. Accordingly, the Court shall hold that the Disputed Funds belong to AHERF except to the extent that the same belong to West Penn by virtue of an application of the doctrine of equitable subrogation.

West Penn contends that it is subrogated to the rights of Travelers, the Commonwealth, and AHERF itself vis-a-vis the Disputed Funds. West Penn asserts that it became subrogated to such rights of Travelers (a) because, argues West Penn, it guaranteed AHERF's indemnification obligation to Travelers, that is AHERF's liability to Travelers by virtue of the Indemnity Agreement executed between those two parties, and (b) by satisfying an obligation to Travelers that was properly that of AHERF, namely such indemnification obligation of AHERF. West Penn apparently argues that it became subro-

gated to such rights of the Commonwealth by acceding via subrogation to the rights of Travelers in the manner discussed in the preceding sentence, which rights of Travelers included a right to be subrogated to the Commonwealth's claim against AHERF, which claim Travelers answered for by virtue of its performance on the Surety Bond. West Penn apparently argues that it became subrogated to such rights of AHERF in the same manner that it became subrogated to such rights of Travelers, that is by virtue of its asserted status as a guarantor for AHERF's indemnification obligation to Travelers and its ultimate satisfaction of such obligation on AHERF's behalf.

The Trustee, in response, argues that West Penn, for several reasons, does not possess any rights of subrogation that would entitle it to the Disputed Funds. First, the Trustee asserts that (a) one can only become entitled to subrogation, as a matter of law, if one pays the debt of another and is legally obligated to pay such debt, that is if one is not a voluntary payor, (b) West Penn, although it satisfied AHERF's indemnification obligation to Travelers, was not itself liable to Travelers with respect to such obligation notwithstanding that West Penn's subsidiaries, that is AGH, Singer, and AUMC, were commonly liable on such obligation, and (c) West Penn was thus a voluntary payor who, accordingly, is not entitled to subrogation. Second, the Trustee contends (a) that, even if West Penn is not considered a voluntary payor without any correspondent right to subrogation, West Penn nevertheless can only be subrogated to the rights of Travelers as of August 30, 2001, which date is when West Penn undertook to pay off AHERF's obligation to Travelers, (b) that Travelers, by virtue of the February 27, 2001 Agreement, waived (i) any and all subrogation rights that it pos-

sessed regarding the Disputed Funds, and (ii) its indemnification claim as against AHERF, and (c) that West Penn on August 30, 2001, thus did not accede to any such subrogation rights or such indemnification claim that Travelers would have possessed some six months earlier before Travelers waived the same. Third, the Trustee argues that West Penn, by virtue of the June 30, 1999 Agreement, itself waived any right, be it by way of subrogation or otherwise, to any of AHERF's receivables such as, *inter alia,* AHERF's right to the Disputed Funds.

The Trustee also maintains that, even if West Penn is entitled to be subrogated to some portion of the Disputed Funds, $548,507.62 of the Disputed Funds, that is the portion that is traceable to workers' compensation claims that AHERF itself paid before it ceased paying claims, is not, in any event, subject to subrogation. The Trustee argues finally that, because AHERF paid the premiums on the excess insurance policy prior to filing for bankruptcy, AHERF is entitled to the $142,248.67 excess insurance carrier refund.

West Penn, as one would expect, raises counterarguments to each of the Trustee's attacks upon West Penn's effort at seeking subrogation to the Disputed Funds, which counterarguments will be addressed below in the body of the Court's analysis.

## I. *Statement of Pertinent Law.*

■ Stated succinctly,

[s]ubrogation is an equitable doctrine "adopted by equity to compel the ultimate discharge of an obligation by him who in good conscience ought to pay it," ... and is generally applicable where one party pays out of its own funds a debt or obligation that is primarily payable from the funds of another.

*Judge v. Allentown and Sacred Heart Hospital Center,* 90 Pa.Cmwlth. 520, 496 A.2d 92, 96 (1985); *see also Kaiser v. Old Republic Insurance Co.,* 741 A.2d 748, 754 (Pa.Super.1999) (same); 73 Am.Jur.2d *Subrogation* § 5 (West 2004). " 'Equitable subrogation' is not a matter of contract and does not arise from any contractual relationship between the parties, but rather ... is a creature of equity and ... arises by operation of law." 73 Am.Jur.2d *Subrogation* § 5.

■ "Case law indicates that once the right to subrogation is established, the subrogee becomes subrogated to all rights of the creditor [whose claim such subrogee satisfied] against the principal debtor, including the security given to secure the debt." *In re Miller,* 72 B.R. 352, 353 (Bankr.W.D.Pa.1987); *see also United States Fidelity and Guaranty Co. v. United Penn Bank,* 362 Pa.Super. 440, 524 A.2d 958, 963–964 (1987) (in construction contract context, "[b]y paying the contractor's debts, the surety acquires the right of substitution to the position of the contractor's creditors when he pays"); 73 Am. Jur.2d *Subrogation* § 5 (equitable subrogation "applies where one who has discharged the debt of another may, under certain circumstances, succeed to the rights and position of the satisfied creditor").

Furthermore, "[a] surety is subrogated to such rights and remedies as the principal has in connection with the debt, which will afford the surety a means of reimbursement.... Generally, a surety claiming to be subrogated to the rights of his or her principal stands in the place of the principal." 73 Am.Jur.2d *Subrogation* § 5; *see also United Penn Bank,* 524 A.2d at 963–964 (" 'The equitable doctrine of subrogation is grounded in the principle that, when one ... fulfills the duties of another, he is entitled to assert the rights of that

other against a third party'"; also, "[i]t is this subrogation principle that entitles the surety to assume the position of those parties he has made whole ... insofar as there are receivables due them"); *accord American Insurance Co. v. Bureau of Workers' Compensation*, 62 Ohio App.3d 921, 577 N.E.2d 756, 759 (1991) ("when equitable, a surety is subrogated not only to the rights of the obligee, but also to the rights and remedies of the principal against third parties, where those rights arise from or are closely related to the debt the surety is called to pay under the suretyship agreement"); *Menorah Nursing Home, Inc. v. Zukov*, 153 A.D.2d 13, 548 N.Y.S.2d 702, 705–706 (N.Y.App.Div. 1989) (same).

Moreover, "an indemnitor of a surety compelled to satisfy the liability of the surety will be subrogated to all rights to which the surety would have been subrogated." 83 C.J.S. *Subrogation* § 59 (West 2004) (citing numerous cases). Such is the case even though (a) "[t]he liability assumed in an indemnity contract is not secondary, but primary," 42 C.J.S. *Indemnity* § 3 (West 2004), and (b) persons who discharge debts on which their liability is primary are not generally entitled to subrogation, *see, e.g.*, 73 Am.Jur.2d *Subrogation* § 5; 73 Am.Jur.2d *Subrogation* § 19 (West 2004). As well,

[g]enerally, a joint debtor, that is one who is from common interest obliged with another to pay a debt [for which both are primarily liable], who discharges more than his or her share of the common debt has a right to compel contribution by way of subrogation. This is appropriate because in equity a joint debtor is regarded as being only a surety for that portion of the debt which should be discharged by his or her co-debtors, and like a surety he or she is entitled to be subrogated, although this can be only to the extent that he or she

has paid more than his or her proportionate share of the debt.

83 C.J.S. *Subrogation* § 25 (West 2004); *see also Lit Bros., to Use of Kaplan v. Goodman*, 144 Pa.Super. 43, 18 A.2d 519, 522 (1941) ("each joint debtor is surety for the other as to the amount beyond his agreed liability").

■ "The doctrine [of equitable subrogation] ... will not be invoked to protect mere volunteers." *Kaiser*, 741 A.2d at 754 (citing *Beck v. Beiter*, 146 Pa.Super. 114, 22 A.2d 90, 93–94 (1941), and quoting *Dominski v. Garrett*, 276 Pa.Super. 18, 419 A.2d 73, 76–77 (1980)); *see also Sacred Heart Hospital Center*, 496 A.2d at 96 (same); *Miller*, 72 B.R. at 353 (same). However,

[t]he right of subrogation is not necessarily confined to those who are legally bound to make the payment, but extends as well to persons who pay the debt in self-protection, since they might suffer loss if the obligation is not discharged. A person who has an interest to protect by making the payment is not regarded as a volunteer. The extent or quantity of the subrogee's interest which is in jeopardy is not material if he has any palpable interest which will be protected by the extinguishment of the debt.

73 Am.Jur.2d *Subrogation* § 22 (West 2004); *see also Beck*, 22 A.2d at 93–94 (same); *Kaiser*, 741 A.2d at 754 (quoting *Dominski*, 419 A.2d at 76–77, for the same proposition); *accord Employers Mutual Liability Insurance Co. of Wisconsin v. Pacific Indemnity Co.*, 167 Cal.App.2d 369, 334 P.2d 658, 663 (1959); *Katschor v. Ley*, 153 Kan. 569, 113 P.2d 127, 136 (1941) (citing, *inter alia*, cases from Texas and Wisconsin).

"Subrogation, being an equity springing from the relation between the parties, and created and enforced for the benefit and

protection of the one in whose favor it is originated, may be modified or extinguished by contract, or may be waived, either expressly or by implication." 83 C.J.S. *Subrogation* § 21 (West 2004); *see also* 83 C.J.S. *Subrogation* § 65 (West 2004) (same); 73 Am.Jur.2d *Subrogation* § 77 (West 2004) (same).

 "[T]he party requesting subrogation has the burden of proving that there is some basis for asserting subrogation, and that subrogation should be allowed in those circumstances." 83 C.J.S. *Subrogation* § 97 (West 2004); *see also* 73 Am. Jur.2d *Subrogation* § 84 (West 2004) (same). Therefore, West Penn bears the burden of proving that it is entitled to all or some portion of the Disputed Funds by way of an application of the doctrine of equitable subrogation.

## II. *West Penn's status as a guarantor, indemnitor, and a surety, and the impact of such status on its right to subrogation.*

 At the outset, the Court rejects West Penn's position that both itself and its subsidiaries were guarantors of AHERF's indemnification obligation to Travelers. The Court suspects that West Penn argues for the existence of such guarantee status so that West Penn can, in turn, then argue that (a) it or its subsidiaries satisfied a debt for which they were not primarily liable but which instead should have been paid by AHERF, and (b) such satisfaction of such obligation entitles West Penn or its subsidiaries to subrogation. Unfortunately for West Penn, nothing in the Stipulated Record or accompanying exhibits establishes that either West Penn or its subsidiaries were such guarantors. Instead, the Stipulated Record and accompanying exhibits establish that West Penn and its subsidiaries did nothing more vis-a-vis the losses that Travelers might incur by virtue of its performance under the Surety Bond other than to incur indemnification obligations themselves to Travelers (i.e., the Indemnity Agreements), which indemnification obligations are indistinguishable from that which AHERF owed to Travelers.

 Of course, West Penn and its subsidiaries were primarily rather than secondarily liable on their indemnification obligation to Travelers, which obligation is that which, according to the Stipulated Record, was eventually satisfied by West Penn and upon which West Penn predicates its right to subrogation. The foregoing notwithstanding, and despite the general rule, as set forth above, that the discharge of a debt upon which one is primarily liable will not entitle one to subrogation, West Penn can take advantage of the rule, also set forth above, that an indemnitor of a surety who is compelled to satisfy the liability of such surety will be subrogated to all rights to which such surety would have been subrogated. By virtue of the application of the latter rule, West Penn, as indemnitor of Travelers, who was a surety for the principals on the Surety Bond, became subrogated to all the rights that Travelers would have become subrogated to, which subrogation right in favor of West Penn accrued when it satisfied its indemnification obligation to Travelers.

 As well, because, as set forth in the Stipulated Record, Travelers and West Penn never paid workers' compensation claims of employees for any of the entities that ultimately became subsidiaries of West Penn (that is, they only paid claims of employees of AHERF), (a) AHERF, as between AHERF and West Penn, should have discharged the entirety of the Indemnification Obligation to Travelers upon which both AHERF and West Penn were commonly liable, (b) West Penn, by satis-

fying the entirety of the Indemnification Obligation to Travelers, thus discharged far more than its proportionate share of such common debt, which proportionate share should have been zero, and (c) West Penn therefore obtained the status of a surety with respect to AHERF for that portion of the Indemnification Obligation to Travelers which should have been discharged by AHERF, that is the entirety of such obligation, thereby entitling West Penn to contribution and, thus, subrogation to the extent of the amount of such obligation and, perhaps more significantly, independent of the rights to which only Travelers would have become subrogated.

### III. Whether West Penn was a voluntary payor?

The Trustee argues that West Penn was a voluntary payor with respect to the Indemnification Obligation to Travelers only because West Penn concededly was not, when its satisfied such debt, itself then commonly liable on such debt. The Court quickly concludes, however, that West Penn was not such a voluntary payor because (a) West Penn's subsidiaries, that is AGH, Singer, and AUMC, were liable on such obligation even though West Penn was not when West Penn satisfied the same, (b) the right of subrogation, as set forth above, is not necessarily confined to those who are legally bound to make the payment, but extends as well to persons who have an interest to protect by making the payment, that is the latter group of persons are also not regarded as voluntary payors, (c) West Penn had an obvious and significant interest in protecting the financial viability of its subsidiaries, which viability might have been seriously challenged had (i) West Penn not stepped in to answer for its subsidiaries' indemnification obligation to Travelers, and (ii) Travelers ultimately obtained a judgment against such subsidiaries in the June 1, 1999 Litigation, and (d) West Penn, by stepping in to answer for its subsidiaries' indemnification obligation to Travelers, thus protected an interest of its own, thereby making it an involuntary payor with a consequent entitlement otherwise to subrogation.

The Court notes as an aside that, because West Penn (a) is not considered to be a voluntary payor with respect to the Indemnification Obligation to Travelers, and (b) thus possesses standing in its own right to seek subrogation, West Penn need not establish, at least so as to satisfy the requirement of standing to seek subrogation, that West Penn's subsidiaries rather than itself satisfied Travelers' Indemnification Claim. Accordingly, West Penn's Motion to Supplement, at least as the same impacts such standing requirement, is rendered moot.

### IV. Whether Travelers waived its pre-petition indemnification claim as against AHERF and the subrogation rights that it possessed regarding the Disputed Funds, and, if so, how such waiver impacts West Penn's asserted entitlement at this time to the Disputed Funds via subrogation?

As set forth above, the Court finds that Travelers, as part of the February 27, 2001 Agreement, waived not only its pre-petition indemnification claim against AHERF but also any right as against AHERF that it possessed regarding such waived indemnification claims. On the basis of such factual finding, the Court comfortably holds that Travelers waived any right that it possessed pre-waiver to be subrogated to (a) the Commonwealth's claim against AHERF, which claim Travelers answered for by virtue of its performance on the Surety Bond, and (b) the rights and remedies that AHERF, Travel-

ers' principal, had in connection with Travelers' Indemnification Claim—i.e., AHERF's rights to at least some portion of the Disputed Funds—that would have afforded Travelers a means of reimbursement on such claim.

The Trustee contends that, because of the above-described waiver by Travelers (hereafter "the Waiver"), and since the Waiver occurred on February 27, 2001, West Penn could not possibly have become subrogated on August 30, 2001, which date is when West Penn undertook to pay off Travelers' Indemnification Claim, to (a) any subrogation right that Travelers would have had some six months earlier regarding the Disputed Funds, or (b) Travelers' indemnification claim as against AHERF, by virtue of which claim West Penn also could seek such subrogation. The Court agrees with the preceding position of the Trustee. In so holding, the Court necessarily rejects the response by West Penn in opposition to such position, to wit that the Waiver is not binding on West Penn because neither West Penn nor its subsidiaries received notice of the Court's hearing, that is the February 27, 2001 hearing at which the Court approved the February 27, 2001 Agreement (hereafter "the Hearing Notice"). The Court rejects such response by West Penn for two reasons. First, the Court holds that West Penn's failure to receive the Hearing Notice does not operate to make the Waiver nonbinding on West Penn. The Court so holds because, since West Penn did not obtain any rights as a potential subrogee until some six months subsequent to February 27, 2001, West Penn was not then entitled to receive the Hearing Notice. Second, the Court holds that the Waiver is binding on West Penn's subsidiaries despite (a) their failure to receive the Hearing Notice, and (b) the rights that they possessed as potential subrogees on Feb-

ruary 27, 2001. The Court so holds (a) because, as set forth above, West Penn's subsidiaries, that is AGH, Singer, and AUMC, each agreed, within the Indemnity Agreements, that they did not need to be notified if Travelers, on terms satisfactory to it, acted to release, among others, AHERF, *see supra* p. 64, (b) because West Penn's subsidiaries thus consented beforehand to the Waiver by Travelers, and (c) since, by virtue of such consent by such subsidiaries, they became bound to the Waiver notwithstanding their failure to receive the Hearing Notice.

As an aside, the Court notes that, because the Waiver is binding on West Penn's subsidiaries as well, it matters not whether West Penn could establish that such subsidiaries rather than itself (a) satisfied Travelers' Indemnification Claim, and (b) are entitled to subrogation through Travelers with respect to the Disputed Funds. The Court so rules because, since West Penn's subsidiaries are bound by the Waiver, they also could not possibly have become subrogated on August 30, 2001, to (a) any subrogation right that Travelers would have had some six months earlier regarding the Disputed Funds, or (b) Travelers' indemnification claim as against AHERF, by virtue of which claim such subsidiaries also could seek such subrogation had they actually paid off Travelers. Therefore, West Penn's Motion to Supplement, at least as the same impacts the ability to become subrogated to either Travelers' indemnification claim as against AHERF or any subrogation right that Travelers possessed prior to the date of the Waiver, is rendered moot.

In light of the foregoing, and notwithstanding West Penn's status as an indemnitor of Travelers who, by virtue of having satisfied its indemnification obligation to Travelers thereby acceded to all of the rights that Travelers then possessed, West

Penn, because of the Waiver, did not become entitled to any portion of the Disputed Funds by way of subrogation through Travelers—that is, West Penn accordingly did not so become subrogated to (a) Travelers' indemnification claim as against AHERF, (b) Travelers pre-waiver right to be subrogated to the Commonwealth's claim against AHERF, or (c) Travelers' pre-waiver right to be subrogated to the rights and remedies that AHERF, Travelers' principal, had in connection with Travelers' Indemnification Claim, namely AHERF's rights to at least some portion of the Disputed Funds. Nevertheless, because West Penn obtained the status of a surety with respect to AHERF for the entirety of Travelers' Indemnification Claim due to the fact that AHERF should have discharged all of such obligation, and since West Penn thereby became entitled to contribution and, thus, subrogation to the extent of the amount of such obligation, West Penn became subrogated not only to the rights of its obligee (i.e., creditor), that is

Travelers (which rights, of course, were given up by way of the Waiver), but also to the rights of its principal, that is AHERF, to the extent that such rights of AHERF arise from or are closely related to the debt that West Penn, as surety, was called to pay, that is Travelers' Indemnification Claim.[7]

## V. *Subrogation via 11 U.S.C. § 509.*

■■■■ Because, as set forth above, West Penn, by virtue of the Waiver, could not have become entitled to some portion of the Disputed Funds by way of subrogation through Travelers, and since subrogation by way of 11 U.S.C. § 509 does nothing more than entitle one to be subrogated to the rights of a creditor of a debtor, *see* 11 U.S.C.A. § 509 (West 1993), and given that Travelers, as West Penn apparently concedes but which in any event the Court finds, is the only conceivable creditor of the instant debtor AHERF through which West Penn could seek subrogation to some portion of the Disputed Funds,[8] § 509 can-

7. To help clarify the point that is made in the text immediately preceding the instant footnote, the Court points out that (a) AHERF was a principal on Travelers' surety obligation under the Surety Bond, and (b) AHERF was also a principal on West Penn's surety obligation with respect to AHERF's share of their common indemnification obligation to Travelers, that is the entirety of Travelers' Indemnification Claim. That being the case, West Penn, absent the existence of the Waiver, became subrogated to the rights of AHERF that arise from or that are closely related to Travelers' Indemnification Claim in two different ways, namely by way of (a) satisfying such indemnification obligation and thereby acceding to Travelers' rights, one of which, absent the Waiver, would have been to become subrogated to such rights of AHERF, Travelers' principal, and (b) its status as a surety in its own right with regard to AHERF, which status also entitles it to become subrogated to the same rights of AHERF, West Penn's principal. Of course, the Waiver operated to deprive West Penn of one of the above methods by which it could become subrogat-

ed to the aforesaid rights of AHERF, that is by way of subrogation to Travelers' rights; however, the Waiver did nothing to affect West Penn's status as a surety itself, which status also ultimately resulted in West Penn's subrogation to the same rights of AHERF.

8. As noted above, the Commonwealth was, at least one time if not now, a creditor of AHERF. However, West Penn cannot utilize § 509 to become subrogated to the rights of the Commonwealth (a) because, if for no other reason, Travelers rather than West Penn satisfied the claim of the Commonwealth as against AHERF, and (b) since one can only become subrogated via § 509 to the rights of a creditor whose claim one actually satisfies oneself, *see* 11 U.S.C.A. § 509(a). Section 509 also provides no help for West Penn with respect to those future workers' compensation claims and related obligations that otherwise would be covered under the Surety Bond the liability for which West Penn agreed to assume from Travelers as part of the August 30, 2001 Agreement. The Court so rules (a) because, even if the liabilities so assumed from

not provide West Penn with any additional ammunition for its subrogation position. Approached differently, West Penn, as set forth above, can only seek subrogation to the rights of its principal, that is AHERF, who, of course, is not a creditor of itself; accordingly, because § 509 only provides a vehicle by which one can become subrogated to the rights of a creditor of a debtor, § 509 does not aid West Penn at all in its attempt to obtain some portion of the Disputed Funds via subrogation.

Since West Penn cannot utilize § 509 to obtain some portion of the Disputed Funds via subrogation, West Penn must confine its subrogation rationale to that which is provided by the common law. If West Penn succeeds in proving an entitlement to some portion of the Disputed Funds via an application of the common law regarding equitable subrogation, then such portion shall, as set forth above, be shielded from the Trustee and AHERF's bankruptcy estate on the ground that such portion does not constitute property of such bankruptcy estate. *See supra* p. 67 (discussing the U.S. Supreme Court's decision in *Pearlman*).

### VI. *Whether West Penn, by virtue of the June 30, 1999 Agreement, itself waived any right to any of AHERF's receivables such as, inter alia, AHERF's right to the Disputed Funds?*

■ The Trustee argues that West Penn, by virtue of the June 30, 1999 Agreement, itself waived any right, be it by way of subrogation or otherwise, to any of AHERF's receivables such as, *inter alia*, AHERF's right to the Disputed Funds. The Court, however, rejects such argument for at least two reasons. First, West Penn was not even formed until November 12, 1999, which date is approximately four and one-half months subsequent to June 30, 1999. Consequently, West Penn could not have been, and of course was not, a party to the June 30, 1999 Agreement, which means that West Penn itself waived nothing by virtue of such agreement. Second, and more importantly, however, the Healthcare Alliance and its components at the time, that is West Penn's present subsidiaries of AGH, Singer, and AUMC, only pertinently agreed, by way of the June 30, 1999 Agreement, that AHERF's present and future receivables would not be transferred to such entities as part of a transfer of assets that was specifically contemplated in such agreement. Such entities did not, by virtue of such agreement, at that time also waive any future right that they might obtain to become subrogated to AHERF's right to such receivables; indeed, a contractual agreement to not obtain receivables as part of a discrete purchase of assets cannot also be viewed as a waiver by such purchaser of the right to obtain such receivables by a means other than such purchase.

Therefore, the June 30, 1999 Agreement does not operate as, *inter alia*, a waiver by West Penn of any right that it might have, be it by way of subrogation or otherwise, to any of AHERF's receivables such as, *inter alia*, AHERF's right to the Disputed Funds.

---

Travelers were technically originally claims of the Commonwealth as against AHERF, West Penn nevertheless cannot successfully argue either that it was liable with AHERF on, or that it secured, any claim of the Commonwealth against AHERF, given that (i) the Commonwealth was not a party to the August 30, 2001 Agreement, and (ii) only Travelers thus can successfully make such argument, and (b) since one can only become subrogated under § 509 if one pays a claim (i) for which one is commonly liable with the debtor, or (ii) that one has oneself secured, *see* 11 U.S.C.A. § 509(a).

## VII. *What portion of the Disputed Funds is West Penn entitled to by way of subrogation?*

 Having already held that the right to the Disputed Funds belongs to AHERF absent subrogation in favor of West Penn, and also having determined that West Penn is entitled to be subrogated to the rights of AHERF that, in particular, arise from or are closely related to Travelers' Indemnification Claim, what portion of the Disputed Funds arises from or is closely related to such obligation?

The Court holds that the portion of the Disputed Funds that arises from or that is closely related to Travelers' Indemnification Claim is that portion that pertains— i.e., is traceable—to workers' compensation claims that were paid by either Travelers or West Penn. With respect to such portion of the Disputed Funds, the Court consequently holds that West Penn is entitled to the same by virtue of equitable subrogation. Conversely, the Court holds that the portion of the Disputed Funds that relates—i.e., is traceable—to workers' compensation claims that AHERF itself satisfied prior to July 21, 1998, which date is when AHERF ceased paying such claims, neither arises from nor is closely related to Travelers' Indemnification Claim, which means that West Penn is not entitled to be subrogated to such latter portion of the Disputed Funds. The Court holds as it does for several reasons.

First, the Disputed Funds represent various types of refunds attributable to AHERF's self-insured workers' compensation program. Because Travelers' Indemnification Claim is comprised, at least in large part, of the workers' compensation claims that Travelers and then West Penn paid on behalf of AHERF, refunds that arise from or that relate closely to Travelers' Indemnification Claim can comfortably be held to be those that are traceable to workers' compensation claims that Travelers and West Penn satisfied. At the same time, little, indeed no, nexus exists between workers' compensation claims that Travelers and then West Penn paid on behalf of AHERF (i.e., the substance of Travelers' Indemnification Claim), on the one hand, and refunds that relate to workers' compensation claims that AHERF itself satisfied, on the other hand. Because of the utter lack of such nexus, the portion of the Disputed Funds that arises from or that is closely related to Travelers' Indemnification Claim could not conceivably include those refunds that relate to workers' compensation claims that AHERF itself satisfied.

 Second, a cardinal principle of subrogation is that a subrogee is only entitled to subrogation to the extent that such subrogee has actually satisfied an obligation. *See supra* pp. 69 & 70; *see also In re Diversified Transportation Resources, Inc.*, 88 B.R. 635, 644–645 (Bankr.D.N.J. 1988) (same). Because neither Travelers nor West Penn satisfied the workers' compensation claims that ultimately gave rise to those refunds that relate to workers' compensation claims that AHERF itself satisfied, neither Travelers nor West Penn are entitled to be subrogated to such refunds. *See Diversified Transportation Resources*, 88 B.R. at 646. Conversely, because Travelers and West Penn satisfied the workers' compensation claims that ultimately gave rise to those refunds that relate to such claims, first Travelers, and now West Penn, is entitled to be subrogated to such refunds. *See Id.* at 646–647.

Because West Penn is entitled to be subrogated to that portion of the Disputed Funds that relates to workers' compensation claims that were paid by either Travelers or West Penn, and since the Court has made a finding that at least

$125,030.70 of the Disputed Funds pertain to workers' compensation claims that were paid by Travelers or West Penn, West Penn is entitled to receive at least $125,030.70 of the Disputed Funds from Acordia. At the same time, because West Penn is not entitled to be subrogated to that portion of the Disputed Funds that relates to workers' compensation claims that AHERF itself satisfied prior to July 21, 1998, and since at least $548,507.62 of the Disputed Funds are traceable to workers' compensation claims that AHERF itself paid prior to July 21, 1998, Acordia shall pay to the Trustee rather than West Penn at least $548,507.62 of the Disputed Funds.

Regarding that portion of the Disputed Funds—not counting the excess insurance carrier refund—which has not yet been assigned, at least on the basis of certain of Acordia's accounting records, between claims paid by AHERF and those that were paid by Travelers or West Penn, that is $1,362.05 of the Disputed Funds, the parties are directed to undertake additional discovery so that they may so assign the $1,362.05 balance. The outcome of such future attribution shall, consistent with the above analysis regarding subrogation to the lion's share of the Disputed Funds, determine whether West Penn should be subrogated to such $1,362.05 balance, or whether the Trustee should receive such amount from Acordia.[9]

▆ As for the $142,248.67 excess insurance carrier refund, Acordia has not attempted to assign such refund between AHERF and West Penn on the basis of who paid the underlying claim that result-

ed in such refund. The Trustee contends that such attribution is unnecessary because, argues the Trustee in turn, that AHERF paid the premiums on the excess insurance policy prior to filing for bankruptcy, by itself, entitles AHERF and, thus, the Trustee to the $142,248.67 refund. Although the Court finds some superficial appeal to the Trustee's argument, the Court, upon deliberation, must reject such argument. AHERF, as a self-insurer of its workers' compensation obligations, was apparently required to obtain some type of excess insurance coverage, be it aggregate excess insurance or specific excess insurance. *See* 34 Pa.Code § 125.11 (2004). Aggregate excess insurance is "[i]nsurance which provides that the excess insurer pays on behalf of or reimburses a self-insurer for its payment of benefits on claims incurred during a policy period in excess of the retention amount to the excess insurer's limit of liability." 34 Pa.Code § 125.2 (2004). Specific excess insurance similarly provides coverage for the payment of benefits for "each occurrence," rather than for claims incurred during a policy period, in excess of the stated retention amount. *See Id.* Because Acordia received the $142,248.67 from AHERF's excess insurer, the Court must presume that such amount constitutes reimbursement by such excess insurer for a payment of benefits that was previously made by either AHERF, Travelers, or West Penn. The Court holds, consistent with the above analysis regarding subrogation to the lion's share of the Disputed Funds, that, if either Travelers or West Penn made the prior payment of benefits

---

9. The Court notes that, since West Penn bears the burden of proof on all issues regarding subrogation, if the Court, after the aforesaid additional discovery, ultimately cannot apportion the aforesaid $1,362.05 balance between underlying claims that were paid by AHERF, on the one hand, and underlying claims that

were paid by Travelers or West Penn, on the other hand, then the Court shall be constrained to rule that such balance is entirely attributable to claims that were paid by AHERF, thereby defeating any recovery via equitable subrogation for West Penn from such balance.

from which the $142,248.67 excess insurance refund arises, then West Penn shall be entitled to such refund via subrogation. *See American Insurance Co.*, 577 N.E.2d at 759 (surety who satisfies it principal's debt is entitled to be subrogated to such principal's right to indemnification from excess indemnity insurer). On the other hand, if AHERF made the prior payment of benefits from which the $142,248.67 excess insurance refund arises, then West Penn shall not be subrogated to such refund, in which event Acordia shall pay the amount of such refund to the Trustee. So as to resolve the issue of entitlement to the $142,248.67 excess insurance refund, the parties are directed to undertake additional discovery so that they may ascertain who paid the underlying claim [10] from which the $142,248.67 excess insurance refund arises.[11]

■ Finally, West Penn opposes the idea of apportioning the Disputed Funds between the Trustee and West Penn as set forth above, and argues in support of such opposition that, solely with respect to $634,475.06 of the Disputed Funds that represent refunds received from Pennsylvania's Workmen's Compensation Supersedeas Fund (hereafter "the Supersedeas Fund"), such apportionment would be flawed because (a) such refunds are made not by the employees (i.e., workmen's compensation claimants) who improperly received benefits but rather are made from the Supersedeas Fund, (b) the Supersedeas Fund was established and is maintained by annual assessments on insurers and self-insurers under Pennsylvania's Workers' Compensation Act, and (c) a more appropriate thing to do rather than such apportionment, argues West Penn in turn, would then be to send the Supersedeas Fund refunds back on a *pro rata* basis to each of the insurers and self-insurers who actually paid the assessments from which ultimately emanate such refunds. The Court disagrees with West Penn's opposition for several reasons. First, West Penn's rationale, because it is directed entirely towards those refunds that came from the Supersedeas Fund, is totally unresponsive to the other refunds that comprise the Disputed Funds; since West Penn offers nothing in the way of rationale as to why the above apportionment would be improper with respect to the balance of the Disputed Funds, the Court need say no more with respect to such balance. Second, the Court finds to be absurd West Penn's suggestion that, instead of the apportionment as directed above by the Court, it would be more appropriate to send the Supersedeas Fund refunds back on a *pro rata* basis to each of the insurers and self-insurers who actually paid the assessments from which ultimately emanate such refunds. West Penn's suggestion is absurd (a) because, as between AHERF on the one hand, and the other insurers and self-insurers that paid assessments into the Supersedeas Fund on the other hand, AHERF possesses the only right to the refunds that flow from such fund to compensate for improper workmen's compensation claims that were made by AHERF employees, and (b) since, given the

10. According to Exhibit I to the Stipulated Record, an employee of AHERF named Mildred Wackowski received the underlying payment of benefits from which the $142,248.67 excess insurance refund arises.

11. Since West Penn bears the burden of proof on all issues regarding subrogation, if the Court, after the aforesaid additional discovery, ultimately cannot ascertain who paid the underlying claim from which the $142,248.67 excess insurance refund arises, then the Court shall be constrained to rule that AHERF paid such underlying claim, thereby defeating any recovery via equitable subrogation for West Penn with respect to such excess insurance refund.

lack of right in such other insurers and self-insurers to such refunds, no basis in law exists for the *pro rata* scheme that is suggested by West Penn. A better argument by West Penn, in contrast to its ill-conceived aforesaid *pro rata* scheme, would have been (a) that, because Travelers and West Penn apparently funded the assessments into the Supersedeas Fund after July 21, 1998, and since the Supersedeas Fund refunds at issue were apparently paid to Acordia after such date, such refunds actually constitute nothing more than a return of money that either Travelers or West Penn, but not AHERF, paid into such fund, and (b) that the foregoing dictates equitable subrogation to such refunds in West Penn's favor. Such argument is equally flawed, however, because West Penn, who has the burden of proof on all issues regarding subrogation, fails to, and likely could not, preponderantly demonstrate that the Supersedeas Fund refunds at issue are directly traceable to Supersedeas Fund assessments that were paid by either Travelers or West Penn. The Court so holds because Supersedeas Fund assessments, since the dollar amount of each is arrived at by an unscientific calculation based upon nothing other than a prior year's experience for each of the insurers and self-insurers, *see* 77 P.S. § 999(b) (Purdon's 2002); 40 Standard Pa. Practice 2d § 167:1263 (West 2003), are equally likely to result in a net carryover of amounts paid into the Supersedeas Fund from one year to the next; of course, given such equal likelihood, it is also equally likely that assessments paid by AHERF before July 21, 1998, rather than assessments apparently funded by Travelers and West Penn thereafter, were the genesis for the Supersedeas Fund refunds at issue, that is such refunds that comprise a portion of the Disputed Funds. Furthermore, because, as explained above, AHERF's right to Supersedeas Fund refunds stems,

in any event, not from assessments into the Supersedeas Fund but rather from improper workmen's compensation claims of its employees, it matters not, for purposes of determining an entitlement to such refunds as between the Trustee and West Penn, the identity of the payor of the Supersedeas Fund assessments that ultimately were utilized to fund such refunds.

As an aside, it matters not whether West Penn could establish that its subsidiaries rather than itself (a) satisfied Travelers' Indemnification Claim, and (b) are thus entitled to be subrogated to the rights of AHERF that, in particular, arise from or are closely related to Travelers' Indemnification Claim. The Court so rules because, even if West Penn could prove the foregoing, West Penn's subsidiaries would nevertheless not be able to become subrogated to any greater amount of AHERF's aforesaid rights than would West Penn. Therefore, West Penn's Motion to Supplement, at least as the same impacts the amount of rights of AHERF to which West Penn or its subsidiaries could become subrogated, is rendered moot.

## CONCLUSION

West Penn is entitled to be subrogated to that portion of the Disputed Funds that relates to workers' compensation claims that were paid by either Travelers or West Penn, which means that West Penn is entitled to receive at least $125,030.70 of the Disputed Funds from Acordia. West Penn is not entitled to be subrogated to that portion of the Disputed Funds that relates to workers' compensation claims that AHERF itself satisfied prior to July 21, 1998, which means that West Penn is not entitled to receive, and Acordia shall consequently pay to the Trustee rather than West Penn, at least $548,507.62 of the Disputed Funds.

Regarding the $142,248.67 excess insurance carrier refund and the $1,362.05 balance of the Disputed Funds, neither of which has thus far been assigned between underlying claims paid by AHERF and those that were paid by Travelers or West Penn, the parties are directed to undertake additional discovery so that they may so assign the same. The outcome of such future attribution shall, consistent with the analysis set forth in the instant opinion regarding subrogation to the lion's share of the Disputed Funds, determine whether West Penn should be subrogated to such amounts, or whether the Trustee should receive such amounts from Acordia. The parties shall have ninety (90) days from the date of the instant opinion and accompanying order to conduct such additional discovery.

West Penn's Motion to Supplement is, for the reasons set forth above, rendered moot. Consequently, such motion is **DENIED WITH PREJUDICE.**

Acordia seeks recovery of its costs and fees that were incurred to bring the instant interpleader proceeding. Because the Court has not yet formally entertained such request, and since the Court is presently unaware of the amount of such costs and fees, the Court shall continue such request until at least the time when the Court next addresses to whom Acordia is to pay the $142,248.67 excess insurance carrier refund and the $1,362.05 balance of the Disputed Funds.

An appropriate order will be entered.

### *ORDER OF COURT*

**AND NOW,** this **9th day** of **July, 2004,** upon consideration of (a) the interpleader complaint filed by Acordia of West Virginia, Inc. (hereafter "Acordia"), which complaint commenced the instant adversary proceeding wherein two of the above-named defendants/claimants, namely the Chapter 11 Trustee (hereafter "the Trustee") for the instant debtors (hereafter collectively referred to as "AHERF") and West Penn Allegheny Health System, Inc. (hereafter "West Penn"), stake a claim to all or a part of a fund presently held by Acordia in the amount of $817,149.04 (hereafter "the Disputed Funds"), (b) the Stipulated Record, which document is described in detail in the accompanying Memorandum Opinion, as well as the exhibits that accompany the Stipulated Record, (c) West Penn's motion to supplement the Stipulated Record (hereafter "the Motion to Supplement"), and (d) the briefs and reply briefs of the Trustee and West Penn; and subsequent to notice and a final hearing on the matters held on May 18, 2004; and for the reasons set forth in the accompanying Memorandum Opinion dated July 9, 2004, it is **hereby ORDERED, ADJUDGED, AND DECREED** that:

(a) **West Penn** is entitled to receive **at least $125,030.70** of the Disputed Funds from Acordia;

(b) **the Trustee** is entitled to receive **at least $548,507.62** of the Disputed Funds from Acordia;

(c) the Trustee and West Penn shall have ninety (90) days from the date of the instant order to take **additional discovery** to determine who should receive the remainder of the Disputed Funds, or **$143,610.72;**

(d) West Penn's Motion to Supplement is **DENIED WITH PREJUDICE;** and

(e) Acordia's request for recovery of its costs and fees that were incurred to bring the instant interpleader proceeding shall be **CONTINUED** for at least the next ninety (90) days.